# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ANNETTE S.,

               Plaintiff,

     v.

ANDREW M. SAUL,
Commissioner of Social Security,

             Defendant.

Case No. 19 C 6518

Magistrate Judge Sunil R. Harjani

## AMENDED MEMORANDUM OPINION AND ORDER[1]

Plaintiff Annette S.[2] seeks judicial review of the final decision of the Commissioner of Social Security finding her ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Annette's motion [13] is granted in part and denied in part, the Commissioner's motion [14] is denied, and the ALJ's decision is remanded.

## BACKGROUND

In May 2013, Annette, a 57 year-old certified nursing assistant, felt a sharp pain in her back when turning a combative patient on his side. (R. 278). A subsequent MRI of Annette's lumbar spine indicated lumbar spondylosis, a disc bulge at L4-L5, a disc fragment extrusion at L1-L2, and a small renal cyst. *Id.* at 279. Annette settled a Workers'

---

[1] This Amended Memorandum Opinion and Order includes minor changes to the Memorandum Opinion and Order issued on February 23, 2021. *See* Doc. [23].

[2] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff by her first name and the first initial of her last name or alternatively, by first name.

Compensation claim relating to her back injury in November 2014, after which time she did not work for approximately one year. *Id.* at 32, 39-40. Then, Annette began working for a senior home care company from roughly 2016 to 2017, but the employer stopped giving Annette home care clients, due to the time she was taking off of work. *Id.* at 40, 172. Annette states that she took time off because her back pain had started again and was getting worse. *Id.* at 40. In addition to Annette's back issues, the record shows that Annette suffered from chronic obstructive pulmonary disease (COPD), diverticulitis, and hypertension. *Id.* at 423-24. Annette's treatment for her ailments has included office visits, the obtaining of medical scans, epidural injections, physical therapy, and prescription medications, such as Lyrica, hydrocodone, pantoprazole, hydrochlorothiazide, and amlodipine. *Id.* at 273, 277, 312, 409, 430.

Annette filed for a period of disability and disability insurance benefits on February 13, 2017, alleging disability beginning September 20, 2016. (R. 60, 155). Annette's claim was initially denied on July 14, 2017 and upon reconsideration on October 6, 2017. *Id.* at 71, 84. Upon Annette's written request for a hearing, she appeared and testified at a hearing held on July 3, 2018 before ALJ Michael Pendola. *Id.* at 28-59. At the hearing, the ALJ heard testimony from Annette and a vocational expert, Cathy Dala. *Id* at 36-58.

On September 27, 2018, the ALJ issued a decision denying Annette's DIB claim. (R. 16-23). At the outset, the ALJ determined that Annette was last insured as of December 31, 2020. *Id*. at 18.[3] Following the five-step sequential analysis, the ALJ found that Annette had not engaged in substantial gainful activity since September 20, 2016, the

---

[3] To be eligible for DIB, a claimant must show that she was disabled as of her date last insured. *See Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012).

alleged onset date (step 1), and that she suffered from the severe impairments of degenerative disc disease and asthma (step 2). *Id*. at 18. The ALJ then determined that Annette's impairments did not meet or equal the severity of a list impairment (step 3). *Id*. at 19.

The ALJ next concluded that Annette retained the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b), except:

> [the claimant could] occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance, and occasionally stoop, kneel, crouch and crawl; avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation; avoid concentrated exposure to extreme cold defined as less than 32 degrees Fahrenheit and extreme heat defined as greater than 80 degrees Fahrenheit.

(R. 19). The ALJ next determined, given this RFC, that Annette was capable of performing her past relevant work as an airport clerk (step 4). *Id*. at 22. Because of this determination, the ALJ found that Annette was not disabled. *Id*. at 23. The Appeals Council denied Annette's request for review on July 31, 2019, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-4; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## DISCUSSION

Under the Social Security Act, a person is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does

the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano*, 556 F.3d at 562; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). In reviewing an ALJ's decision, the Court may not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and h[is] conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted); *see also Fisher v. Berryhill*, 760 Fed. Appx. 471, 476 (7th Cir. 2019) (explaining that the "substantial evidence" standard requires the building of "a logical and accurate bridge

between the evidence and conclusion"). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Annette raises a number of issues in support of her request for reversal of the ALJ's decision. Before turning to those issues, the Court notes that the briefing in this case suffers from the same inadequacies the Court has noticed in the briefing in numerous other social security cases. As seems to be a persistent pattern in the briefing in social security cases, the parties fail to meaningfully and fully develop the issues involved and fail to directly address each other's arguments. These failures impede the Court's efficient consideration of the matter. In this case, the Court had to spend large amounts of time deciphering the claimant's arguments to even make sense of them. Throwing a whole host of alleged deficiencies with the ALJ's decision at the Court, without development, and seeing what sticks, is not appropriate or appreciated. Nor will this Court repeatedly do the work for the claimant's lawyer by diving into the record to support cursory arguments that counsel raises, which is primarily what happened here. Whereas the Commissioner's brief, although more intelligible, failed to address the claimant's clearest and strongest argument, despite having ample space to do so—the Commissioner's brief is nine pages long. In contrast, this Court's opinion addressing the issues is thirty-eight pages long. The failures in basic legal writing skills in social security cases is disappointing and seems to a repeat occurrence in this district. In the future, the Court expects counsel in social security cases to more thoroughly develop their arguments and directly address the specific arguments raised by the other party.

Annette's arguments can be fairly bucketed into the following four concerns: (1) the ALJ's Step Two determination omitted some of Annette's impairments; (2) the ALJ's step four determination was erroneous per the regulations and DOT; (3) the ALJ improperly weighed the medical opinions; and (4) the ALJ's subjective symptom analysis was flawed. *See* Doc. [13-1]. As discussed further below, Annette has failed to identify any errors meriting remand with respect to the ALJ's step two and step four determinations. However, Annette has highlighted significant problems, albeit briefly, with the ALJ's weighing of the medical opinions and with respect to his subjective symptom analysis. In short, the ALJ improperly relied on the outdated opinions of the state agency physicians, despite the new and potentially decisive evidence about Annette's impairments that came after their reviews. The ALJ further cherrypicked the evidence and exaggerated Annette's activities of daily living in order to discount Annette's testimony regarding her severe lumbar pain and leg impairments. The Court accordingly remands the ALJ's decision.

## A.     The ALJ's Step Two Determination

Beginning with Annette's unavailing positions, Annette first contends that the ALJ's step two finding (that Annette suffered from degenerative disc disease and asthma) is not supported by substantial evidence because Annette also suffered from lumbar spondylosis and lumbar radiculopathy associated with a L1-L2 disc herniation, two impairments that the ALJ did not include in his severe impairments finding. Doc. [13-1] at 7. Generally, in order to find a severe impairment or combination of impairments in step two, the impairment(s) must significantly limit the claimant's physical or mental ability to perform basic work activities for at least twelve consecutive months. *See* 20 C.F.R. §§ 404.1520(c) & 404.1521(a). Yet, courts rarely find an omission in step two to be

harmful, as the step two finding is merely a threshold finding. So long as one impairment is named by the ALJ to be severe, the ALJ will move on and consider both the claimant's severe and non-severe impairments. *See, e.g.*, *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citation omitted) (emphasis in original) (holding any error of omission in Step 2 harmless where ALJ categorized two impairments as severe, as "[d]eciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment").

Here, as discussed below, the Court shares Annette's concern that Annette's lumbar radiculopathy was not adequately considered by the ALJ in his RFC analysis. Yet, for purposes of step two, there is no harmful error. Annette maintains that the ALJ's failure to find lumbar spondylosis and lumbar radiculopathy as severe impairments "profoundly affected the ALJ's residual functional capacity," but the Court does not see how. Once the ALJ found that Annette had at least one severe impairment, the ALJ "needed to consider the *aggregate* effect of [Annette's] entire constellation of ailments—including those impairments that in isolation are not severe." *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (citations omitted) (emphasis in original). The ALJ in this case found two impairments to be severe: degenerative disc disease and asthma. As such, the ALJ went on to the following steps. Therefore, any error in omission by the ALJ in not naming lumbar spondylosis and lumbar radiculopathy as severe impairments was harmless.

## B.     Step Four Determination

Annette next argues that the ALJ's conclusion at step four that Annette could perform her past relevant work as an airport clerk was erroneous. Doc. [13-1] at 14-15.

According to Annette, this is so for at least two reasons. First, Annette avers that the airport job she performed differed from the airport clerk job described in the DOT, in terms of both exertion and job duties. *Id.* at 14. Second, Annette contends that the ALJ failed to confirm with the vocational expert (VE) on the record that her testimony was consistent with the DOT, and that such a failure was fatal to the ALJ's step four determination. *Id.* at 14-15. However, neither issue raised by Annette makes the ALJ's step four determination unacceptable, as explained below.

### 1. Airport Job as Performed by Annette

Annette worked as a clerk for United Airlines from 2006 to 2007. (R. 187). Annette testified that her duties as a clerk included going to terminals and collecting and transporting money bags to the United office, calculating the dollar amounts, and securing the money in the company's safe. *Id.* at 49. Annette was therefore on her feet most of the day and was lifting between 50 to 60 pound bags of money. *Id.* at 49-50. Annette stated that she would lift the bags up and put them in a cart that she would push from each terminal. *Id.* at 50. The VE classified Annette's past work as that of an airport clerk, DOT Code 219.362-010. *Id.* at 53. According to the VE, the DOT denoted the airport clerk job as being a semi-skilled job with a light exertional level. *Id.* However, based on Annette's testimony, the VE opined that Annette actually performed the airport clerk job at the medium exertional level. *Id.* In his step four analysis, the ALJ relied on this testimony of the VE and concluded that Annette was capable of performing her past relevant work as an airport clerk, as generally performed per the DOT, in accordance with the light work RFC determined by the ALJ. *Id.* at 22-23.

Annette argues that the "first problem" with the ALJ's step four conclusion is that Annette performed the airport clerk job at the medium exertional level, not the light one. Doc. [13-1] at 14. Annette is correct that there is an inconsistency between the exertional level she performed while working as an airport clerk (medium) and the exertional level indicated by the DOT for the airport clerk job (light). Indeed, the VE and ALJ acknowledged that Annette performed the airport clerk job at the medium exertional level. (R. 22, 53). However, that inconsistency does not undermine the ALJ's step four determination. A finding that the claimant is capable of performing past relevant work requires only one of the following: either (a) the claimant can perform the past work in the manner actually performed by the claimant in the past; or (b) the claimant can perform the work in the manner the work is generally performed in the national economy. *See Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008) (citations omitted) ("[T]he ALJ need not conclude that the claimant is capable of returning to the precise job he used to have[.]"); 20 C.F.R. § 404.1560(b)(2); SSR 82-61, 1982 WL 31387, at *2 (explaining that a claimant who "cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy" should not be found to be disabled).

Here, the VE testified—and the DOT indicates—that the airport clerk job is generally performed at the light exertional level; the ALJ determined that Annette could perform light work. The VE further testified that the specific hypothetical selected by the ALJ for Annette's RFC was consistent with the manner in which the airport clerk job is generally performed in the national economy. (R. 54). Therefore, the ALJ's step four determination conforms with the regulations.

In addition to the exertion level discrepancy, Annette challenges the duties listed for an airport clerk in the DOT as being impermissibly distinct from her past duties. Doc. [13-1] at 14. According to Annette, the DOT states that an airport clerk's duties include "giving information to and interviewing customers, employees and sales personnel; preparing, issuing and sending out receipts, bills, policies invoices and checks; preparing stock inventory; adjusting complaints; operating office machines such as typewriter and duplicating machines, and preparing payroll, keeping books, purchasing supplies and operating a computer terminal." *Id.* Annette insists that those listed duties are "not even remotely equivalent" to the duties described by Annette in her work history report, and as testified to by Annette at her hearing. *Id.*

Yet, a closer look at Annette's work history report and DOT Code No. 219.362-010 reveals overlapping duties. In her submitted work history report, Annette stated that when she worked for United Airlines, she "[r]etrieved money from multiple terminals, entered [and] recorded money in database [,] utilized paging [and] alert system to notify personnel." (R. 217). DOT Code No. 219.362-010 lists similar duties, such as "[t]abulates and posts data in record books," "[r]eceives, counts, and pays out cash," "[m]ay operate computer terminal to input and retrieve data," "[o]perates office machines, such as typewriter, adding, calculating, and duplicating machines," and "[g]ives information to and interviews customers, claimants, employees, and sales personnel." Doc. [19-1] at 1. The Court therefore initially disagrees that the tasks described by Annette are all that distinct from the DOT-listed duties for an airport clerk. At any rate, the VE, a trained expert in assessing job functionality and availability, opined that Annette's time at United Airlines should be classified as that of an airport clerk, DOT Code No. 219.362-010. (R. 53). That

opinion supported the ALJ's step four determination. Annette has consequently failed to identify an error with respect to differences between Annette's airport clerk work as performed and with the airport clerk descriptions found in DOT Code No. 219.362-010.

### 2. Consistency between VE Testimony and DOT

The ALJ failed to ask the VE in this case if her testimony was consistent with the DOT. Annette insists that that failure means that the ALJ's step four finding is not supported by substantial evidence. Doc. [13-1] at 15. It is true that the ALJ has an affirmative responsibility to inquire as to conflicts between the VE's testimony and the DOT. *See* SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) (ALJ has "affirmative responsibility" to ask if the VE's testimony conflicts with the DOT, and if there is an "apparent conflict," the ALJ must obtain a "reasonable explanation"). However, such an error is harmless, unless the claimant shows that there is a conflict between the VE's testimony and the DOT. *See, e.g.*, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (citation omitted) ("Terry is correct that the ALJ did not ask the VE if his testimony conflicted with the DOT. However, the error is harmless unless there actually was a conflict.").

In this case, Annette has failed to name any actual conflicts between the VE's testimony and the DOT; none is readily apparent to the Court. Annette maintains that the very failure to ask the VE if her testimony was consistent with the DOT is the conflict because the ALJ substituted his own opinion for that of the VE. Doc. [19] at 7. But that argument is circular and misses the point—the failure to ask the VE if her testimony is consistent with the DOT is only harmful if there is actually a conflict between the VE's testimony and the DOT. Annette's other proffered "conflict" falls flat as well. Annette

claims that the ALJ erroneously relied on the VE's testimony that an airport clerk job was light (per the DOT), in contravention of SSR 00-4p. *Id.* at 7-8. According to Annette, if the exertional demands of an occupation meet the regulatory definition of "medium work" the ALJ may not rely on VE testimony that the occupation is "light work." *Id.* at 8. Yet, Annette's own submission belies this claim, as the DOT entry for Code No. 219.362-010 explicitly states that the strength level for the clerk job is "L," which designates a light exertional level. *See* Doc. [19-1] at 1; Dictionary Of Occupational Titles Appendix C: Components of the Definition Trailer;[4] *Taylor v. Astrue*, No. 1:10-CV-01486-TWP, 2012 WL 1014837, at *4 (S.D. Ind. Mar. 23, 2012). Accordingly, the VE's testimony that the airport clerk job was generally performed at the light level was consistent with the DOT; that testimony does not present a conflict with the DOT.

In sum, Annette has failed to highlight a harmful error in the ALJ's step four analysis. The ALJ followed the regulations' guidelines with respect to assessing past relevant work and relied on the testimony of a vocational expert.

## C. Weighing of Medical Opinions

Annette makes several arguments regarding the ALJ's weighing of medical opinions in this case, and at least one of those arguments holds water.[5] Annette rightly criticizes the ALJ for giving great weight to the opinions of the non-examining state agency physicians, whose record examinations missed Dr. Lim's treatment records and other subsequent critical evidence about the severity of Annette's impairments.

---

[4] Available at https://occupationalinfo.org/appendxc_1.html#STRENGTH (Feb. 22, 2021).

[5] Because the Court remands on this basis, as well as the subjective symptom analysis issue discussed below, the Court does not address Annette's other arguments about the ALJ's weighing of medical opinions.

Generally, the regulations favor medical opinions from treating physicians over non-treating doctors, "since [treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).[6]  However, despite the regulations' preference for the opinions of treating physicians, there is no categorical rule prohibiting ALJs from giving greater weight to non-examining state agency physicians.  In fact, such decisions are reviewed merely for substantial evidence and are, not infrequently, upheld. *See, e.g.*, *Pytlewski v. Saul*, 791 F. App'x 611 (7th Cir. 2019); *Ketelboeter v. Astrue*, 550 F.3d 620 (7th Cir. 2008).

At the same time, the Seventh Circuit has held that substantial evidence does not support an ALJ's decision to give greater weight to non-examining state agency physicians who have not reviewed medical records relevant to determining a claimant's functional limitations. *See, e.g.*, *Thomas v. Colvin*, 826 F.3d 953 (7th Cir. 2016) (ALJ's uncritical acceptance of state agency doctors' conclusions over that of treating physician's opinion was not supported by substantial evidence where state agency physicians did not examine

---

[6] In this case, it does not seem like there is an opinion from a treating source in the record.  Annette refers to Dr. Lim as her treating orthopedic physician and suggests that his November 2017 treatment record constituted the opinion of a treating physician. *See* Doc. [13-1] at 13.  Yet, Annette's record in this case only includes two treatment records from Dr. Lim. (*See* R. 398-404). In addition, Dr. Lim's November 2017 record offers no opinions as to Annette's specific functional abilities.  As a result, the Court is not convinced that Dr. Lim offered the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(a).  Regardless, the Court finds that the ALJ erred in giving great weight to the opinions of the state agency physicians, so the Court need not decide the proper classification for Dr. Lim in this case.

claimant and did not review later treatment records diagnosing claimant with fibromyalgia and degenerative changes in shoulder); *see also Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (citations omitted) ("The ALJ instead gave 'significant weight' to the agency consultants' opinions, but these consultants did not examine Meuser, they are not psychiatrists (though one was a psychologist), and they had reviewed only a fraction of Meuser's treatment records that were available before Meuser submitted additional evidence."); *Hoyt v. Colvin*, 553 F. App'x 625, 627-28 (7th Cir. 2014) (holding ALJ could not solely rely on state agency physicians where state agency physicians never examined claimant or reviewed results of EMG or MRI tests and where their dated opinions could not account for how claimant's condition might have deteriorated).

The Seventh Circuit revisited the issue of an ALJ's reliance on the outdated opinions of non-examining state agency physicians in a recent unpublished decision, *Kemplen v. Saul*, No. 20-1651, 2021 WL 345751 (7th Cir. Feb. 2, 2021). In *Kemplen*, the state agency physicians opined in early 2016 that the claimant was capable of work at the light exertional level, despite the bone spurs on her back, chronic neck and back pain, high blood pressure, anxiety, muscle spasms, and high cholesterol. *Id.* at *1. In 2017, however, the claimant's condition significantly deteriorated. *Id.* at *2. Specifically, the claimant visited the emergency room in July 2017, reporting shooting pain in her fingers. *Id.* Then in September 2017, the claimant met with a spine specialist who concluded that the claimant's radiographic findings were compatible with generalized bone pain in the setting of "mild degenerative spondylosis of the cervical and lumbar spine." *Id*. Contemporaneous physical therapy records further demonstrated that the claimant could not grip or carry heavy things. *Id.* In this same time period, the claimant obtained x-ray and MRI scans

concerning her spine and hand impairments. *Id.* The ALJ relied on the state agency physicians' 2016 opinions and found the claimant not disabled; the district court affirmed. *Id.* at *3. On appeal, the claimant argued that ALJ impermissibly played doctor by neglecting to seek an updated medical opinion regarding the 2017 objective scans and treatment records. *Id.*

The *Kemplen* Court began its analysis by reiterating the prohibition on ALJs interpreting new, significant medical evidence without the assistance of a doctor: "This court has stated repeatedly that an ALJ may not 'play[ ] doctor and interpret new and potentially decisive medical evidence without medical scrutiny.'" 2021 WL 345751, at *3 (citations omitted). The court conceded that "not all new evidence" following the state agency physicians' opinions will necessitate a remand, as the Seventh Circuit has "upheld the denial of benefits when MRI evidence post-dating the state agency consultant's report showed only mild changes in the claimants' respective conditions." *Id.* (citing *Keys v. Berryhill*, 679 F. App'x 477 (7th Cir. 2017) and *Olsen v. Colvin*, 551 F. App'x 868 (7th Cir. 2014)). The *Kemplen* Court subsequently summarized the Seventh Circuit's jurisprudence as providing the following standard: "the ALJ must seek an additional medical opinion if there is potential decisive evidence that postdates the state agency consultant's opinion." *Id.* at *4 (citations omitted). Accordingly, the court framed the determinative question as "whether the new information 'changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report.'" *Id.* at *3 (citation omitted). In applying that question to the claimant's record, the court found that although it was a close call, the ALJ erred by not soliciting an updated medical opinion interpreting the

claimant's 2017 objective scans. *Id.* Significant to the *Kemplen* court's conclusion was the fact that the 2017 objective scans were inconsistent with the ALJ's findings and corroborated by other medical evidence postdating the state agency physicians' opinions. *Id.* at \*3-\*4.

In this case, the two state agency physicians had access to Annette's medical records through October 5, 2017. On July 1, 2017, state agency physician Dr. Prasad Kareti determined that Annette was capable of work at the light exertional level. (R. 65-69). Upon reconsideration on October 5, 2017, state agency physician Dr. Reynaldo Gotanco affirmed Dr. Kareti's light RFC determination. *Id.* at 78-82. As a result, the state agency physicians did not review several of Annette's medical records, including Dr. Lim's treatment records, a November 2017 MRI,[7] a November 2017 X-ray, and a February 2018 treatment record stating Annette had "lumbar spondylosis with radicular symptoms involving both lower extremities." (R. 403, 404, 432, 459).

Here, although a close call like in *Kemplen*, the Court finds that the aforementioned evidence postdating the state agency physicians' opinions did change the picture of Annette's condition to a degree that the ALJ erred in continuing to rely on their opinions, and by evaluating himself the significance of the subsequent evidence. Taking the subsequent evidence in chronological order, the Court explains why the records constitute "potential decisive evidence that postdate[d] the state agency consultant's opinion." *Kemplen*, 2021 WL 345751, at \*4.

---

[7] Both Annette and the ALJ refer to a December 2017 MRI, but by the Court's review, there was only one MRI obtained near the time of Dr. Lim's examination, and that was the MRI obtained on November 21, 2017. (R. 459). Dr. Lim interpreted that MRI at his follow up appointment with Annette on December 15, 2017, but no new MRI was obtained at that time. *Id.* at 402-03. Therefore the Court does not analyze the importance of any December 2017 MRI.

Annette presented to orthopedist Dr. Lim on November 3, 2017. (R. 398). Annette reported low back pain at an 8/10 level, which she stated was made worse with kneeling, sitting, bending, stairs, twisting moving, lying in bed, walking, lifting, and reaching overhead. *Id.* Dr. Lim reviewed Annette's conservative care history, conducted a general examination, a lumbar spine examination, and a lower extremities examination. *Id.* at 398-99. The treatment record further reflected that four or more views of the lumbosacral spine were "ordered, obtained[,] and interpreted from an orthopedic standpoint," which included "[r]adiographs of the lumbar spine from [an] outside facility" which were "grossly unremarkable." *Id.* at 400. At the end of the record, Dr. Lim diagnosed Annette with "Intervertebral disc disorders with radiculopathy, lumbosacral region," and listed a treatment plan. *Id.* In the treatment plan, Dr. Lim stated that he discussed treatment options with Annette, but that the treatment would be unlikely to get rid of the pain. *Id.* Dr. Lim additionally noted Annette's "absent left Achilles reflex and subjective complaints of pain down her left leg." *Id.* Finally, Dr. Lim ordered an MRI for Annette's lumbar spine and referred Annette to Christ Hospital Pain Clinic for chronic pain management. *Id.* At the December 15, 2017 follow up visit, in which Dr. Lim reviewed the MRI of Annette's lumbar spine, Dr. Lim reaffirmed Annette's diagnosis of invertebral disc disorders with radiculopathy, and found that Annette's symptoms were "more likely associated with an L1-2 disc herniation." *Id.* at 403. Dr. Lim determined that "[n]onsurgical management [was] indicated," ordered an epidural injection, and prescribed Norco 5/325. *Id.*

Hence, Dr. Lim's treatment records were potentially decisive in that they introduced a new symptom and diagnosis in Annette's case and provided objective support for Annette's pain. While the state agency physicians were aware of Annette's disc

extrusion at L1-L2, (*See* R. 76, 79), Dr. Lim's findings demonstrated that Annette suffered from lumbar radiculopathy, a diagnosis not identified by either of the state agency physicians. Annette further presented a new symptom to Dr. Lim, her absent Achilles reflex, which was not known to the state agency physicians and which was found to be significant by Dr. Lim. (R. 400). On top of that, Dr. Lim's reports offered new and important objective support for Annette's chronic and severe pain. The state agency physicians discussed Annette's "reports" and "claims" of spine and leg pain and found that Annette's statements about her symptoms were only partially consistent with the record, finding that her activities of daily living "are excessive in degree in light of the objective findings." *See, e.g.*, *id.* at 65, 77. Dr. Lim's records, which corroborated Annette's claims of severe and chronic pain, introduced a new symptom, and included a doctor's diagnosis of lumbar radiculopathy for the first time, therefore changed the picture so much regarding her impairments that the ALJ "erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report.'" *Kemplen*, 2021 WL 345751, at *3.

The November 2017 MRI and x-ray likewise constitute potentially decisive evidence coming after the state agency physicians' reviews. Annette's lumbar spine MRI from that time listed the following impressions: "Mild degenerative disc disease at the L1-L2 level with a small disc extrusion" and "No significant central spinal canal stenosis or neural foraminal stenosis in the lumbar spine." (R. 459). The November 2017 x-ray stated that "Radiographs of the lumbar spine from outside facility are grossly unremarkable," but listed an impression mirroring Dr. Lim's diagnosis: "Intervertebral disc disorders with radiculopathy, lumbosacral region." *Id.* at 404. Admittedly, phrases like "mild

degenerative disc disease" and "grossly unremarkable" do not sound earth shattering to the lay ear. However, that lackluster language did not stop Dr. Lim, a trained physician specializing in orthopedics, from concluding that Annette had chronic spine pain and lumbar radiculopathy associated with her herniated disc at L1-L2. *Id.* at 403. The 2017 x-ray indicated that Annette suffered from radiculopathy, which further provided objective support for Annette's claim that her lumbar spine pain had spread to her legs. *See Brinkley v. Astrue*, No. 1:10–CV–263, 2012 WL 1035443, at *3, n.3 (N.D.Ind. Mar. 27, 2012) (citing Spine Interest Group, http://www.mayclinic.org/neurology/spinegroup.html) ("Lumbar radiculopathy is chronic pain which occurs in the lower back and legs and is caused by compressed nerve roots in the spine."). Hence, the 2017 scans provided updated, important data about the worsening of Annette's conditions. The state agency physicians formed their opinions about Annette's functional capabilities without access to those records, and there was no updated opinion translating those scans into an RFC from a treating physician. It was therefore an error for the ALJ to interpret those records without the aid of a medical expert.

Finally, Annette's February 2018 treatment record, too, changed the picture of Annette's conditions so much that it was an error for the ALJ to rely on the outdated opinions of the state agency physicians and determine himself the significance of the record. On February 21, 2018, Annette presented to the Advocate Christ Medical Center's pain clinic for an initial evaluation. (R. 430). At the time, Annette reported a pain level of 5/10, which she stated was made worse with physical activity and improved slightly through medication and rest. *Id.* Dr. Donkoh observed that Annette had "difficulty tolerating straight leg raise test due to discomfort," as well as "an antalgic gait." *Id.* at 431.

Dr. Donkoh checked boxes indicating that there was radiological evidence of central disc herniation and degenerative disc disease. *Id.* at 432. Dr. Donkoh also noted that Annette did not have to wait 4 weeks for pain management care because she has "[s]evere pain unresponsive to outpatient medical management." *Id.* In the impression and plan section of the medical record, Dr. Donkoh stated that Annette's clinical diagnosis was "lumbar spondylosis with radicular symptoms involving both lower extremities," and that Annette was advised that she "could be scheduled for lumbar epidural steroid injection to address radicular symptoms." *Id.*

The February 2018 record thus presented new and critical information regarding Annette's spinal condition and pain, which rendered the state agency physicians' opinions outdated. Certainly not all of the information in the pain clinic document would have been new to the state agency physicians. The state agency physicians' opinions demonstrate that they were aware of Annette's disc herniation, degenerative disc disease, lumbar spondylosis, and her claim that pain radiated from her lumbar spine to her left leg. (*See, e.g.*, R. 273, 274, 279, 376). Yet, the state agency physicians' opinions make no mention of Annette struggling with a straight leg raise test, nor that she experienced radicular symptoms in her right leg (as opposed to just the left leg). The state agency physicians further did not discuss any issues with Annette's gait. In fact, the state agency physicians' opinions indicate that they relied on evidence concerning Annette's negative straight leg raise test, her "normal gait," and her "partially consistent" claim of pain in the left lower extremity[8] in formulating their opinions that Annette could stand and/or walk for 6 hours

---

[8] As discussed above, the state agency physicians generally listed pain, weakness, and fatigue as Annette's symptoms but found that her statements regarding those symptoms were only "partially consistent" with the record, due to her activities of daily living, which the state agency physicians found "excessive in degree in light of the objective findings." (R. 65, 77).

in an 8-hour workday. *Id.* at 67, 78, 79, 80. The contrary evidence showing straight leg raise test issues, an antalgic gait, and radicular symptoms in the left and right legs changed the picture so much that the state agency physicians' determination that Annette could stand and/or walk for most of the work day became stale and needed an updated medical review. The state agency physicians' findings were buttressed by their view that Annette's statements about her pain were only "partially consistent" with the record. *Id.* at 65, 77. This pain clinic evaluation, which appears to provide additional objective evidence in support of Annette's claims of disabling back pain, also calls into question the state agency physicians' credibility determination. The Court finds that the February 2018 record—like Dr. Lim's records and the 2017 objective scans—offered new and weighty enough evidence regarding Annette's impairments that the ALJ should have had a doctor review it and determine the importance of it. It was an error for the ALJ to rely on the state agency physicians' opinions, when those state agency physicians did not have access to this new and potentially decisive information about Annette's impairments.

While the Commissioner offers no response to Annette's argument regarding the ALJ's reliance on the state agency physicians' outdated opinions, the Commissioner generally contends that Annette should have sought the opinion of a treating physician. Doc. [15] at 5. According to the Commissioner, Annette chose not to obtain the opinion of a treating physician, and that this Court should therefore infer that Annette's failure to get a new opinion means that her counsel believed that "another expert would not help." *Id.* (citing *Gloria S. v. Berryhill*, No. 18 C 50095, 2019 WL 2435858, at *3 (N.D. Ill. Jun. 11, 2019). Along those same lines, the Commissioner avers that if Annette found that

a treating opinion necessary, her counsel "could have alerted the ALJ to this fact when he asked whether additional evidence was needed." Doc. [15] at 5.[9]

Although the Court acknowledges Annette's burden in providing medical evidence regarding her conditions, the Court declines to hold the lack of a new treating physician opinion against Annette in this case. Perhaps Annette's attorney should have alerted the ALJ to the need for an updated RFC opinion, but regardless, the ALJ still had a duty to obtain additional evidence if the record was insufficient to make a disability determination. The Commissioner ignores the fact that "[i]t is an ALJ's responsibility to recognize the need for further medical evaluations of a claimant's conditions before making RFC and disability determinations." *Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) (citations omitted). Annette bore "the burden of producing medical evidence that supports her claims of disability." *Kemplen*, 2021 WL 345751, at *4 (7th Cir. 2021) (internal quotation marks and citations omitted). "[T]he [claimant's] burden is to produce evidence, not opinions." *Id*. (citation omitted). Annette met her burden by coming forward with medical evidence showing back and leg related limitations, which included Dr. Lim's records, the November 2017 objective scans, and the February 2018 pain clinic record, all of which rendered the state agency medical opinions stale. At that point, the ALJ had an obligation to seek an additional medical evaluation of Annette's physical condition before

---

[9] The Commissioner further touts the ALJ's going beyond the restrictions indicated by the state agency physicians in finding more precise postural and environmental limitations. Doc. [15] at 3. But that is the very problem the Court is concerned with in this case. Instead of translating the new, potentially decisive evidence into an RFC himself without expert assistance, the ALJ should have obtained an updated opinion from an expert. While it is the province of the ALJ to construct an RFC, *see Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007), the ALJ nevertheless has the responsibility to recognize the need for further medical evaluations before making the RFC. *Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) (citations omitted). In this case, the ALJ failed to recognize that need.

assessing the exertional and postural limitations she required. The ALJ failed to do so and erred by relying on the outdated opinions of the state agency physicians and interpreting himself the significance of the new and potentially decisive evidence that came after.

## D.    Subjective Symptom Evaluation

Annette further challenges the ALJ's subjective symptom determination. The Court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510. An ALJ must justify his evaluation with "specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support."). When assessing a claimant's subjective symptom allegations, an ALJ must consider several factors, including the objective medical evidence, the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304, at *5, 7-8 (Oct. 25, 2017). Ultimately, "the ALJ must explain her [subjective symptom evaluation] in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (internal quotations omitted). And, "[n]ot all of the ALJ's reasons must be valid" in a subjective symptom analysis, "as long as enough of them are." *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009).

Annette testified that she had difficulties in terms of balance, suffered from pain spasms in her back and left leg, and had swelling in her left knee. (R. 40-41). Annette also stated that she had experienced falls, and was utilizing Lyrica, Hydrocodone,

Hydrochlorothiazide, Amlopdipine, and an inhaler. *Id.* at 42. Annette claimed to use a back brace and knee brace in addition. *Id.* at 42. Annette further testified that she only drives one to two times per month because she could not sit for longer than an hour. *Id.* at 43. Annette additionally said that she could not stand longer than a couple of minutes and had difficulty standing in line. *Id.* at 43. Annette stated that she does not lift anything more than ten pounds, that she reclined for three to four hours a day, and that she had some difficulties in dressing herself, in terms of buttoning shirts in the back and tying her shoes. *Id.* at 44. Annette reported that she could not reach overhead, bend, stoop, or grocery shop. *Id.* at 45. In a typical day, according to Annette, she gets up, gets breakfast, takes her medications, and tries to go for a walk. *Id.* at 46-47. Then, Annette reclines, gets lunch around noon, tries to walk again, reclines again, and then lies on the floor. *Id.* at 47. Annette stated that Lyrica makes her stomach hurt, and that she becomes depressed thinking about burdening her family. *Id.* In terms of household chores, Annette testified that she is only able to do a little dusting and help prepare food, all while sitting, because she can't stand at the sink or stove for very long. *Id.*

In assessing Annette's subjective symptom allegations, the ALJ first summarized Annette's submitted capabilities, as disclosed in her Function Report. (R. 20). The ALJ then stated that Annette had been prescribed "numerous medications, such as Hydrochlorothiazide, Pantoprazole, Hydrocodone, and Lyrica[.]" *Id.* Next, the ALJ stated that "[a]t the hearing, the claimant testified that she gets back pain that radiates down to her leg[.]" (R. 20). After discussing the medical records, the ALJ concluded that Annette's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the evidence[.]" *Id.* at 21. All in all, the ALJ found three

reasons for discounting Annette's subjective symptom allegations: (1) "conservative treatment"; (2) "good objective physical/mental status examination findings"; and (3) "admitted activities of daily living." *Id.*[10]

Annette attacks the ALJ's conservative treatment and good objective examinations bases for discounting her testimony.[11] As discussed below, the Court finds that Annette has successfully identified significant problems with the ALJ's subjective symptom analysis, particularly with respect to the ALJ's having cherry-picked the record for favorable objective signs supporting the ALJ's light RFC determination. The Court further finds that the ALJ's assessment of Annette's activities of daily living was invalid. Because at least two of the three reasons for discrediting Annette were unsound, the ALJ's subjective symptom analysis was patently wrong in this case.

### 1. Conservative Treatment

Annette avers that the ALJ improperly relied on Annette's purportedly "conservative treatment" in assessing her subjective symptom allegations. *See* Doc. [13-1]

---

[10] The Commissioner claims that the ALJ provided another, fourth reason, for discounting Annette's testimony by discussing the normal objective findings regarding Annette's asthma, (*see* R. 21), however the Court sees the asthma findings as part of the ALJ's second "good objective physical/mental status examination findings" reason.

[11] Annette also argues that the ALJ's use of the "not entirely consistent phrase" employed a too rigorous standard in evaluating Annette's subjective allegations. Doc. [13-1] at 11-12 (citing *Farley v. Berryhill*, 314 F. Supp. 3d 941, 946 (N.D. Ill. 2018)). However, because the ALJ went on after using the boilerplate phrase to provide support for the generic statement that Annette's allegations were not entirely consistent with the record, no fatal error occurred. *See, e.g., Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013) ("[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination."). In this case, the ALJ used the "unedifying, conclusory" statement that Annette's allegations were "not entirely consistent" with the record, *see Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 883 (N.D. Ill. 2019), but also recited the correct standard at the beginning of the ALJ's RFC analysis. (*See* R. 20). Then, the ALJ went on to provide three reasons for discounting Annette's testimony. *Id.* at 21. As a result, the Court does not find that the ALJ committed a reversible error in this case merely by using the ubiquitous "not entirely consistent" language.

at 8. As a general matter, an ALJ is entitled to consider the routine and conservative nature of a claimant's treatment in assessing the claimant's credibility. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(v). An ALJ can, by and large, discount a claimant's testimony in light of routine and conservative treatment, so long as the ALJ does not unreasonably minimize the extent of the claimant's treatment, *see Huber v. Berryhill*, 732 F. App'x 451, 456 (7th Cir. 2018), play doctor, *See Suess v. Colvin*, 945 F. Supp. 2d 920, 929 n.13 (N.D. Ill. 2013); or make assumptions about the claimant's failure to seek treatment without asking the claimant about the reasons for noncompliance, *see Keiper v. Berryhill*, 383 F. Supp. 3d 819, 823 (N.D. Ind. 2019) (collecting cases). Several courts have, therefore, upheld the ALJ's reliance on a claimant's conservative treatment in discrediting a claimant's testimony. *See, e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Vincent A. v. Berryhill*, No. 16 C 7136, 2019 WL 2085104, at *12 (N.D. Ill. May 13, 2019).

Here, Annette initially argues that the ALJ improperly relied on his lay opinions with respect to Annette's conservative treatment. Doc. [13-1] at 8. Annette declares that because the ALJ never delineated or defined what he meant by "conservative treatment," the ALJ considered his own subjective notions about her medical treatment to discredit her opinions. *Id*. However, it is not the ALJ who concluded that Annette's treatment was conservative. Rather, it was Annette's doctors, including Dr. Lim, who stated that her treatment was conservative. (*See, e.g.*, R. 273, 398, 438). The ALJ merely adopted the characterization expressed by Annette's doctors. Importantly, the ALJ did not insert his lay assessment regarding what kind of treatment would be conservative, so the Court does

not find that this case suffers from the improper doctor-playing addressed in *Suess*. Annette's first "conservative treatment" argument misses the mark.

Annette second argues that the ALJ's "conservative treatment" finding reflects an error of law because Dr. Lim looked at Annette's "conservative treatment" and reached the opposite conclusion as the ALJ. Doc. [13-1] at 8-9. That is, the ALJ viewed Annette's conservative treatment as undermining her symptom allegations, whereas Dr. Lim assessed Annette's "conservative care history," and stated that the conservative treatment had not changed Annette's symptoms. *Id.* According to Annette, because the ALJ failed to address Dr. Lim's contrary opinion regarding Annette's treatment, the ALJ failed to build the requisite and logical bridge from the evidence regarding Annette's conservative treatment to the ALJ's decision to discount her symptom allegations. *Id.* at 9.

This second "conservative treatment" argument has more traction. Dr. Lim, in reviewing Annette's treatment history, wrote the following under a heading labeled "Conservative Care History": "There has been no change in the symptoms with ice, heat, muscle relaxers, physical therapy, injection and TENS Unit." (R. 398).[12] Later, in his treatment plan, Dr. Lim wrote that he had advised Annette that he would "unlikely be successful in getting rid of her pain as she has had chronic lower back pain for over 4 years." *Id.* at 400. At her follow up appointment with Dr. Lim, he stated that "[n]onsurgical management is indicated," and that "[a]n epidural injection was ordered and should the patient not respond further options for treatment or surgery [would] be discussed." *Id.*

---

[12] Confusingly, Dr. Lim's record states right before this sentence that the symptoms "have improved with ice, muscle relaxers, physical therapy, injection and TENS unit." (R. 398). However, within the context of Dr. Lim's subsequent comments about being unable to help Annette's chronic pain, it appears the inclusion of the first sentence (indicating symptoms had improved) was a typographical error.

at 403. Dr. Lim accordingly ordered an epidural injection, prescribed pain medication, provided education regarding home exercises, and referred Annette to a pain management specialist. *Id.* These records show that Dr. Lim did not view Annette's conservative treatment to mean that her pain was not real or not severe, and Dr. Lim also stated that further options for treatment or surgery would be discussed if Annette did not respond to the epidural injection. To Annette's point, because the ALJ did not discuss Dr. Lim's treatment plans or conservative care history review, it is unclear whether and how the ALJ weighed Dr. Lim's seeming corroboration of Annette's pain allegations.

It is further difficult to trace the ALJ's reasoning in discrediting Annette's pain testimony in light of her conservative treatment when the record shows that the conservative treatment was not working to remedy her ailments. After all, "conservative care is relevant to a symptom evaluation *if* a claimant is able to manage his or her impairments without requiring more aggressive measures." *Jose L. v. Saul*, No. 18 C 4904, 2020 WL 264521, at *4 (N.D. Ill. Jan. 17, 2020) (emphasis in original) (citations omitted). But the record here shows that Annette was not managing her pain, and that more aggressive measures might be needed. As Dr. Lim stated, surgery and other treatment options would be discussed if Annette did not respond to the epidural injections. (R. 403). Indeed, Annette testified that one of her doctors discussed surgery with her and said Annette had a "50/50 chance." *Id.* at 48. According to Annette, that doctor stated that he was not sure if surgery would help or make Annette's pain worse. *Id.* Annette further testified that she had recently gotten an epidural injection, but that she was still suffering from back spasms, and that the providing doctor acknowledged that the epidural injections might not work either. *Id.* at 48.

This is not a case, then, where the claimant "alleges crippling pain but takes only the occasional aspirin." *Geer v. Berryhill*, 276 F.Supp.3d 876, 887 (E.D. Wis. 2017). Rather, this is a case where a claimant suffering a work injury alleges crippling back pain and pursues several types of treatment to no avail, including heavy pain narcotics, epidural injections, and physical therapy. Significantly, Annette tried to go back to work a year after her injury but was unable to manage her pain. (R. 39-40). Furthermore, it is not just Annette's testimony and Dr. Lim's records that corroborate Annette's pain allegations. Dr. Donkoh, the pain specialist who met with Annette in February 2018 excluded Annette from the 4 week waiting period for narcotics because she found that Annette suffered from "[s]evere pain unresponsive to outpatient medical management." *Id.* at 432.

All in all, the Court shares Annette's concern that the ALJ might not have constructed the requisite accurate and logical bridge in its "conservative treatment" assessment. That said, the Court acknowledges that the ALJ's subjective symptom determination is entitled to deference; the Court is hesitant to reweigh the evidence regarding the nature of Annette's treatment. *See Murphy*, 759 F.3d at 815-16. In any case, because the Court finds that the ALJ's two other reasons for discounting Annette's subjective symptom allegations are invalid, the Court need not decide whether the ALJ's conservative treatment analysis was wrong in this case.

### 2. Cherry-picked Objective Findings

Annette contends that the ALJ failed to consider the evidence supporting her allegations regarding her spinal impairments, and instead cherry-picked the record for evidence supporting the ALJ's non-disability determination. Doc. [13-1] at 9, 12. "ALJs need not address every piece of evidence in the record, but an ALJ may not ignore an entire

line of evidence contrary to her ruling." *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (internal citation omitted). In other words, the ALJ " 'must confront the evidence that does not support her conclusion and explain why that evidence was rejected.' " *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)). The ALJ likewise "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted).

Here, the ALJ found that Annette's "good objective physical/mental status examination findings," in addition to her receipt of conservative treatment and admitted activities of daily living, "suggest[ed] that the claimant's impairments are not as severe as she alleged, and instead support[] a conclusion that she remains capable of performing work within the restrictions set forth herein." (R. 20). In support of the ALJ's "good" objective examinations conclusion, the ALJ cited to only four pages in Annette's entire record, writing:

> Although the claimant has been diagnosed with degenerative disc disease, exams frequently showed 5/5 strength in all muscle groups, normal range of motion, negative straight leg raise test, no focal neurological deficit, sensory perception to pin prick and touch sensation is equal on both sides, normal deep tendon reflexes, can get on and off the exam table with no difficulty, can get up from the sifting position with no difficulty, can stand on either leg unsupported, and had non- antalgic gait without the use of assistive devices.

(R. 21). With respect to Annette's asthma, the ALJ similarly stated: "Although the claimant has asthma, exams frequently showed no respiratory distress, normal respiratory rate and effort, no accessory muscle use, breath sounds clear to auscultation bilaterally, lungs are clear to auscultation and percussion and no rales, rhonchi or wheezing." *Id.*

While the ALJ did not misstate the record in pulling out these apparently "good" objective findings—albeit the Court is skeptical of the word "frequent" being used to describe three examinations in the record—the ALJ failed to confront the "bad" objective findings in the record which tended to support Annette's allegations. For instance, the ALJ highlighted Annette's negative straight leg raise test results from her consultative examination with Dr. Osei in June 2017 and her examination with Dr. Lim in November 2017. *Id.* at 375, 399. Yet the ALJ failed to deal with the record documenting Annette's "complete check-up" at Park Primary Care in March 2017, in which Dr. Johnson observed that Annette had a positive straight leg raise result on the left. *Id.* at 387. In fact, there is no indication that the ALJ reviewed that record at all. The ALJ's failure to consider the Park Primary Care record is further complicated by the fact that Dr. Johnson opined that Annette had an antalgic gait, a symptom not mentioned in the ALJ's decision anywhere, despite the fact that Dr. Donkoh echoed Annette's antalgic gait problem in February 2018. *Id.* at 431. In the same way, the ALJ accentuated Annette's purportedly frequent "normal deep tendon reflexes," while failing to mention Dr. Lim's finding that Annette had an absent Achilles reflex on the left. *Id.* at 400. If the ALJ considered and rejected Dr. Lim's finding regarding Annette's Achilles reflex, the ALJ failed to explain why he rejected the evidence, so the Court cannot trace the ALJ's reasoning. Overall, the ALJ disregarded and failed to reckon with the "bad" objective examinations showing that Annette had limitations with respect to her lower extremities. Hence, the Court finds the ALJ in this case erroneously ignored an entire line of evidence regarding Annette's limitations.

The Commissioner claims that the ALJ expressly considered the evidence regarding Annette's impairments, and that Annette is merely luring the Court into reweighing the evidence. Doc. [15] at 4. However, the Commissioner has not, and cannot show that the ALJ adequately grappled with the evidence regarding Annette's antalgic gait, positive straight leg raise result, and absent Achilles reflex. Moreover, the Commissioner's examples of the ALJ's proper consideration exemplify the ALJ's selective reading. For instance, the Commissioner contends that the ALJ adequately assessed Dr. Lim's November 2017 treatment record. *Id.* But by the Court's review, aside from noting Annette's reduced range of motion and tenderness at the bilateral paraspinal, the ALJ completely disregarded the other "bad" objective findings from Dr. Lim's record, particularly Annette's absent Achilles reflex, diagnosis of radiculopathy, and referral to a pain clinic to help manage Annette's chronic pain. (R. 399-400). Furthermore, the Court cannot "reweigh" evidence that was not weighed by the ALJ in the first instance. Because the ALJ did not even mention the objective findings regarding Annette's gait and reflex, the Court cannot be confident that the ALJ considered them. Consequently, the Court finds that the ALJ's "good" objective findings reason for discrediting Annette was impermissibly cherry-picked in this case.

### 3. Activities of Daily Living

Finally, the Court addresses the ALJ's third reason for discounting Annette's testimony, her admitted activities of daily living.

While daily activities may be used to discredit a claimant's testimony*, see Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citations omitted), the Seventh Circuit has denounced decisions which fail to recognize the "critical differences" between

activities of daily living and activities in a full-time job, such as flexibility in scheduling, getting help from others, and not being held to a minimum standard of performance. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). *See also Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (remanding where claimant's ability to do limited work to maintain his small farm did not adequately support ALJ's conclusion that he would be able to work full time). "Without acknowledging the differences between the demands of such activities and those of a full-time job, the ALJ [is] not entitled to use [the claimant's] performance of life activities as a basis to determine that [his] claims of a disabling condition [are] not credible." *Ghiselli v. Colvin*, 837 F.3d 771, 777-78 (7th Cir. 2016). For instance in *Cullinan v. Berryhill*, the Seventh Circuit remanded the decision of an ALJ who drew an "impermissible inference[ ]" by relying on a claimant's ability to perform household chores without explaining "why doing [the] household chores was inconsistent with [claimant's] description of [ ] pain and limited mobility," and where no inconsistency was obvious. 878 F.3d 598, 603-04 (7th Cir. 2017).

The ALJ in this case found that "[t]he claimant's admitted activities of daily living also suggest the claimant is not as limited as alleged and remains capable of performing work within the restrictions set forth herein." (R. 21). Specifically, the ALJ highlighted that Annette "reported being capable of preparing meals, performing housework, cleaning, doing laundry with assistance, watching television, reading, playing cell phone games, and shopping despite her symptoms." *Id.* In support, the ALJ cited Annette's self-completed function report from February 2017. *Id.* (citing 197-204). The ALJ did not discuss Annette's testimony concerning her activities of daily living from September 2018 in evaluating Annette's credibility. In fact, the only mention the ALJ made of Annette's

testimony came earlier in his RFC analysis, when the ALJ recalled Annette testifying that she had side effects from her medication and that she claims to get back pain that radiates down to her leg. *See id.* at 20.

The ALJ did not discuss Annette's more recent statements about her activities of daily living, which portrayed more restricted activities of daily living than the ALJ's summary suggests. Annette testified to using a back and knee brace daily in order to manage her pain and in order to walk approximately the length of one block. (R. 43). Annette stated that she could not be in a car for more than an hour, and had difficulties standing more than a couple of minutes at a time. *Id.* Annette further testified in order to keep comfortable during the day, she uses her recliner for three to four hours, takes medication, applies Biofreeze to her back, and lies on the floor to perform back exercises. *Id.* at 44. Annette reported having difficulties dressing herself and stated that she could not reach overhead and had to have her daughter-in-law wash her hair for her. *Id.* at 45. Annette explained that she could not grocery shop alone, and that if she does go with her son or daughter-in-law, she walks with the cart but could not push it or do the actual shopping. *Id.* Annette denied doing household chores and stated that her only housework consisted of "a little dusting." *Id.* at 47. Annette said that she could sit to help prepare food, but that she could not stand at the sink or the stove for very long. *Id.* In sum, Annette's testimony showed that Annette had several limitations in her activities of daily living.

The ALJ's assessment of daily activities in this case is unsound because the ALJ failed to consider the serious limitations in Annette's daily activities. The ALJ stated that Annette "prepared meals," without acknowledging her testimony that she tried to "help

prepare food, but [had to] sit and do everything, because [she] can't stand at the sink or stove for very long." (R. 47).   Even the adult function report Annette completed in February 2017, which the ALJ relied on, clarified that Annette prepared only sandwiches, frozen foods, and dinners. *Id.* at 199.   The ALJ found, again based on the old function report, that Annette was not as impaired as she claimed because she did housework, cleaned, and did laundry with assistance. *Id.* at 21.   But the ALJ ignored Annette's more recent testimony that her housework consisted of merely attempting to do some light dusting. *Id.* at 47.   In a similar vein, the ALJ stated that Annette shopped "despite her symptoms," without addressing her testimony that she did not shop alone anymore and that if she went with her son or daughter-in-law, she simply walked with the cart, could not push the cart with food in it, and did not do the actual shopping herself. *Id.* at 45.   The ALJ's discussion of daily activities was therefore improper in part because the ALJ failed to consider the qualifications on Annette's daily activities. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (citations omitted) ("an ALJ cannot disregard a claimant's limitations in performing household activities"); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008) (emphasis in original) ("The ALJ ignored Craft's qualifications as to how he carried out those activities . . . Each activity left him exhausted.").

The ALJ further failed to explain why Annette's admitted daily activities were inconsistent with Annette's lumbar impairments and COPD.   An ALJ must "explain the 'inconsistencies' between [a claimant's] activities of daily living ... complaints of pain, and the medical evidence." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (citation omitted).   The ALJ here did not explain how Annette's being capable of preparing sandwiches and frozen meals, watching television, doing some light dusting, and walking

with a cart at the grocery store was inconsistent with Annette's claims of severe pain in her back and legs. And perhaps more importantly, no inconsistencies are apparent. Take the ALJ's focus on Annette reading, watching television, and playing games on her cell phone for example. Annette testified that she experienced such severe pain in the form of muscle spasms in her back and legs, that she ended up reclining for three to four hours a day, took pain medications, and performed exercises while lying down on the floor. *Id.* at 44. Nothing about that would indicate that Annette could not read, watch television, or play games on her cell phone. Annette's attempting to perform some light dusting is likewise not inconsistent with Annette's claims of disabling pain, as she testified that when she was feeling well enough she attempted to go out for walks of up to one block in length. *Id.* at 43-44.

To sustain full time employment, Annette needed to be able to perform tasks to specific standards with limited breaks. *See Bjornson*, 671 F.3d at 647. Annette's ability to walk alongside a cart, attempt some light dusting, help prepare foods while sitting, watch television, and play games on her cell phone in the limited way discussed above does not indicate that Annette could hold down a fulltime job, and the ALJ fails to explain how those activities were inconsistent with his subjective symptom allegations.[13] The ALJ's daily activity analysis was therefore erroneous. *See Cullinan*, 878 F.3d at 603-04.

---

[13] The Commissioner suggests that the ALJ reasoned that Annette's "claims of being able to walk one block, stand only for 30 minutes, and sit for only 30 minutes were in conflict with her daily activities, such as preparing meals, performing housework, cleaning, washing laundry, and shopping." Doc. [15] at 6-7. The Commissioner's post-hoc reframing of the ALJ's discussion fails because the ALJ did not even acknowledge Annette's hearing testimony regarding her limitations in sitting, walking, and standing, let alone explain how that testimony was inconsistent with Annette's qualified activities of daily living. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

The ALJ's subjective symptom determination in this case is patently wrong because at least two of the ALJ's three reasons for discrediting Annette were invalid. That is, the ALJ cherrypicked "good" objective findings in order to find her testimony less credible, and failed to properly assess her activities of daily living by failing to consider the qualifications on those activities and by failing to explain the purported inconsistencies between her activities and claims of pain. Remand is therefore required for the ALJ to reassess Annette's subjective symptom allegations.

### E.   Harmless Error

Bringing it all together, the Court finds that the ALJ erred in at least two respects in this case: (1) the ALJ's weighing of the medical opinions; and (2) the subjective symptom determination. Neither one of these errors constitutes a harmless error. Harmless error occurs when "it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" because remanding would be "a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

In this case, both the ALJ's weighing of the medical opinions and Annette's subjective symptom determination allowed the ALJ to find that Annette was capable of performing her past work as an airport clerk, a job considered to have a light exertion level according to the DOT. If the ALJ had obtained a more recent medical opinion to review the evidence postdating the state agency physicians' review, or if the ALJ had properly assessed Annette's testimony regarding her pain, it is possible that the ALJ would have found a more restrictive RFC for Annette, one that would have disqualified her from performing her past work as an airport clerk. In that case, Annette's age and education

could have led the ALJ to conclude that Annette was disabled, per the regulations. This possibility was played out in the ALJ's second hypothetical to the vocational expert. The ALJ asked the vocational expert whether somebody with Annette's age, education, and past relevant work could transfer any of her skills from her past jobs into a sedentary job. (R. 54). The vocational expert responded that Annette had the transferable skills of information giving and recordkeeping, but that too much vocational adjustment would be involved for Annette to qualify. *Id.* at 56. In short, if the ALJ had not made errors in his weighing of the opinions and assessment of Annette's testimony, he might have found that Annette was not qualified to perform her relevant past work, which could have led to a finding of disability. Thus, it is not predictable with great confidence that the agency would reinstate its decision on remand, and the ALJ's error is not harmless.

On remand, the ALJ must obtain an updated medical opinion as to Annette's functional capabilities, in light of the new and potentially decisive evidence that came after the state agency physicians' opinions. The ALJ must also reassess Annette's subjective symptom allegations, while taking care to avoid cherry-picking the record and exaggerating Annette's activities of daily living.

## **CONCLUSION**

For these reasons, Annette's motion for summary judgment [13] is granted in part and denied in part, the Commissioner's motion for summary judgment [14] is denied, and the decision of the ALJ is remanded.

**SO ORDERED.**

Dated:  May 14, 2021

_____
Sunil R. Harjani
United States Magistrate Judge